CHESTER ZUKOWSKI, Jr., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zukowski v. Commissioner
Docket No. 2309-85.
United States Tax Court
T.C. Memo 1992-150; 1992 Tax Ct. Memo LEXIS 168; 63 T.C.M. (CCH) 2383; T.C.M. (RIA) 92150; March 16, 1992, Filed *168 Decisions will be entered under Rule 155. Chester Zukowski, Jr., pro se. Julius Gonzalez, for respondent. RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the years 1977 and 1978 in the amounts of $ 65,053 and $ 225,402, respectively. The sole issue for decision is whether petitioner received unreported income in the amounts of $ 163,920 and $ 348,264 in taxable years 1977 and 1978, respectively. [1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts *169 have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. The petition originally filed in this case was on behalf of petitioner and his then wife, Donna Zukowski (now Donna Dietz). At the time of filing, petitioner was incarcerated in the Federal Penitentiary in Marion, Illinois. On September 15, 1988, we granted Donna Zukowski's motion to sever her case from petitioner's. On May 27, 1988, petitioner ratified and affirmed the original petition. During the years in issue, petitioner owned and operated Hollywood Flying Service, Inc., with Ms. Dietz. Hollywood Flying Service, Inc. (HFS), was a Florida corporation which was a fixed base operation where various services for aircraft were offered, including maintenance, tie down, and flight instruction. HFS also owned a number of airplanes which were available for charter. Petitioner also worked as an informant for the United States Customs Service during the years in issue. Pursuant to this role, petitioner would agree to purchase airplanes for individuals involved in drug trafficking and register those airplanes in his *170 own name or the name of one of his corporations. These airplanes were purchased with money belonging to someone other than petitioner. Petitioner would inform Customs officials of these transactions and of any actual use of an airplane for the importation of drugs. When an airplane that petitioner had purchased at the request of a drug trafficker was seized during an arrest, the airplane would be returned to petitioner as the registered owner, and he was then free to sell the airplane. Petitioner conducted the majority of his transactions with cash. Consequently, Joan Beer, the accountant for HFS and petitioner, had to rely heavily on petitioner's verbal representations in compiling company books and completing company and personal returns. Ms. Beer also received some information regarding the company's aircraft from Mark Roth, attorney for petitioner and HFS. Ms. Beer prepared HFS' stockholder loan account ledger sheets for fiscal years ending October 31, 1978 and 1979, from information provided her by petitioner, Ms. Dietz, Mark Roth, and HFS' bookkeeper. On August 5, 1977, HFS and Bailey Leasing Corporation (Bailey) entered into an aircraft lease and option agreement pertaining *171 to a King Air airplane, registration number N5111U. This agreement provided for a downpayment of $ 50,000 for the aircraft lease and the option to purchase the airplane during the term of the lease for $ 209,000. HFS did not have sufficient funds in its account on August 8, 1977, to make the $ 50,000 downpayment on the aircraft lease. On August 8, 1977, petitioner paid Bailey a downpayment of $ 50,000 for the lease pertaining to the King Air. On November 17, 1977, petitioner exercised the option to purchase the King Air by paying $ 50,000 to Bailey. On November 17, 1977, Bailey issued a receipt for $ 50,000 to petitioner. HFS did not have the funds available in its account on November 17, 1977, to make the $ 50,000 payment. The King Air was listed on HFS' fixed asset schedule. It was recorded as acquired in November 1977 with a cost basis of $ 259,000. This was the only King Air airplane affiliated with HFS' operations. An aircraft bill of sale filed with the Federal Aviation Administration dated October 25, 1977, showed the purchaser of the King Air as Golden Steed Aircraft, Ltd. Golden Steed Aircraft, Ltd., did not exist on October 25, 1977. Petitioner and Ms. Dietz, *172 not Golden Steed Aircraft, Ltd., reported the rental income and expenses pertaining to the King Air airplane on Schedule E of their 1977 Federal income tax return. On February 14, 1978, petitioner made the final payment on the King Air airplane of $ 168,246.40. Petitioner sold the King Air on December 7, 1978, for $ 270,000. Petitioner deposited the sales price in his personal account, withdrew it, and then deposited it into the account of HFS. In 1978, HFS also listed on its fixed asset schedule a Queen Air airplane, registration number 35PK. The schedule indicated that the airplane was acquired February 2, 1978, at a cost basis of $ 55,000. The aircraft bill of sale also showed the purchaser of the airplane as Golden Steed Aircraft, Ltd. Golden Steed Aircraft, Ltd., did not exist on February 2, 1978. The Queen Air was acquired from Thomas Farese, who acquired it from William Tobin, who had acquired it from petitioner's attorney Mark Roth. According to records of the Federal Aviation Administration, each of these transfers occurred on the same day, February 20, 1978. HFS did not have sufficient funds in its account at Southeast Bank of Miramar in February 1978 to make the *173 $ 55,000 payment. In April of 1978, petitioner and his attorney caused Golden Steed Aircraft, Ltd., a Bahamian corporation, to be incorporated. Petitioner formed Golden Steed Aircraft (GSA) for purposes of anonymity because of his work as a Customs' informant. Petitioner and Ms. Dietz owned a home in Davies, Florida, which was titled in the name of GSA. GSA subsequently deeded the house back to petitioner and Ms. Dietz. No money was paid to GSA in consideration of the transfer of title to the house, nor was any rent paid to GSA for petitioner's and Ms. Dietz's use of the house. Petitioner and Ms. Dietz filed joint Federal income tax returns for taxable years 1975, 1976, 1977, and 1978 showing taxable income of $ 16,931, $ 6,065, $ 29,399, and $ 104,750, respectively. Petitioner was convicted of two counts of tax evasion in violation of section 7201 for taxable years 1977 and 1978. The criminal tax evasion case involved issues of unreported income for 1977 and 1978 identified to those set forth in the statutory notice of deficiency. For purposes of petitioner's net worth at the beginning and end of the years at issue, the following assets, liabilities, expenditures, and other *174 adjustments consistent with the net worth method have been established in this record by stipulation of the parties. Cash in Banks
12/31/76
12/31/77
12/31/78
A. Nevada National Bank
1. Acct. #14-067878-4
--
--
$ 9,060.47
Checking Account
2. Acct. #14-067012-7
--
$ (14,834.34)
3,482.29
Checking Account
B. Southeast Bank
1. Acct. #12-9834-8
$    (28.40)
210.50 --
Checking Account
C. Miami National Bank
1. Acct. #18725
50,000.00 50,000.00 --
Certificate of Deposit
Horses
A. HIP #455
--
--
1,700.00
B. HIP #321
--
--
1,400.00
C. HIP #364
--
--
800.00
Automobiles
A. 1974 Cadillac
--
--
5,000.00
6L67S4Q431221
B. 1977 Blazer
--
8,435.25 --
CKL187F182277
C. 1978 GMC Truck
--
--
9,174.50
TKL188F516757
D. 1978 Cadillac
E6D47S8E655082
--
--
13,025.00
E. 1974 Blazer
5,000.00 --
--
CKY184F106007
F. 1975 Monte Carlo
3,825.00 --
--
1H57Y5B474418
G. 1977 Cadillac
--
12,609.00 --
6D4757E661341
H. 1976 Ferrari GT4
--
--
20,000.00
I. 1977 Moto Guzzi
--
2,500.00 2,500.00
Aircraft
A. Ercoupe 415-C
--
2,500.00 --
N93611
Real Estate
A. Miramar Residence
12,800.00 12,800.00 12,800.00
B. Lake Tahoe Property
--
26,103.35 261,465.72
C. Flying Little River
--
--
34,408.20
Property
Common Stock
A. Hollywood Flying Service
5,000.00 5,000.00 5,000.00
B. Hollywood Flying School
500.00 500.00 --
Investment in Golden Steed
Aircraft, Ltd.
--
--
50,000.00
Equipment Rental Receivable
18,645.17 48,645.17 48,645.17
Loans Receivable
A. Loans to Lee Allen
--
--
In Dispute
B. Loan to Hollywood Flying
4,385.00 --
--
School
C. Loan to Hollywood Flying
76,520.09 In Dispute In Dispute
Service
*175 As of December 31, 1976, 1977, and 1978, petitioner had the following liabilities: Mortgages
12/31/76
12/31/77
12/31/78
A. Dade Federal Savings and
$  8,880.66
$   8,567.53
$   8,260.43
Loan-Miramar Residence
B. Purchase Money Mortgage-
--
--
30,726.00
Flying Little River Property
Notes Payable
A. Installment Note Payable-
--
--
75,000.00
Lake Tahoe Property
B. Promissory Note Payable-
15,000.00
15,000.00
--
Curtis Sherrod
Loans Payable
A. Loans Payable to Southeast Bank
1. Auto Loan-1975 Monte Carlo
3,500.00
--
--
2. Auto Loan-1974 Blazer
2,500.00
--
--
B. Construction Loan Payable
--
--
169,486.47
to Golden Steed Aircraft, Ltd.
C. Loan Payable to Hollywood
--
5,948.28
--
Flying School
D. Loan Payable to Billy Lee
--
--
51,000.00
Skidmore
The parties stipulated that petitioner's net worth on December 31, 1976, was $ 146,766.20. The parties also stipulated that petitioner made personal expenditures totaling $ 7,406.70 and $ 50,919.43 in 1977 and 1978, respectively, that petitioner made no gifts in 1977, and that petitioner experienced nondeductible personal losses amounting to $ 7,544.25 and had nontaxable capital *176 gains of $ 4,750 for taxable year 1978. OPINION The only issue for decision is whether petitioner received unreported income for the taxable years 1977 and 1978, respectively. Respondent's determination was based on his reconstruction of petitioner's income for these years. Respondent used the net worth plus expenditures method of determining petitioner's taxable income. Under this method, a taxpayer's income is computed by determining the excess of his assets at cost, less his liabilities, at the beginning and the end of each tax year. The difference between these two figures represents the increase (or decrease) in the taxpayer's net worth. Such difference is then adjusted by adding nondeductible expenditures, such as personal living expenses, and by subtracting nontaxable sources of income, such as gifts, inheritance, loans, and the like. See ; . Thus, an increase in a taxpayer's net worth, plus his nondeductible expenditures, less nontaxable receipts, is considered taxable income. *177 Petitioner did not contest respondent's entitlement to use the net worth plus expenditures method and stipulated all but two aspects of respondent's determination of his income: (1) The amount of loans receivable from HFS, Inc., in 1977 and 1978, and (2) the amount of loans receivable from Lee Allen in 1978. Petitioner's loans receivable, to the extent that they exist, are assets belonging to petitioner. Respondent contends that the amount of loans receivable from HFS on December 31, 1977, is $ 189,784.70. This figure was arrived at by taking the balance from the stockholder loan portion of the HFS' general ledger on December 31, 1977, of $ 89,784.70 and adding the $ 100,000 petitioner paid on the purchase price of the King Air airplane, which was booked and depreciated by HFS. Respondent also contends that on December 31, 1978, petitioner had $ 485,039.54 in loans receivable from HFS. This number is based again on the balance of stockholder loans recorded in HFS' general ledger as of December 31, 1978, of $ 261,793.14 plus $ 168,246.40 (the remaining purchase price of the King Air airplane paid by petitioner) plus $ 55,000 paid by petitioner for the Queen Air airplane, which *178 was also booked and depreciated by HFS. Petitioner does not contest the inclusion of amounts recorded as shareholder loans on HFS' books in respondent's net worth calculation. However, petitioner asserts that respondent overstated the increase in his net worth during the years at issue because the funds with which petitioner purchased the King and Queen Air airplanes, used by HFS, were proceeds of loans to petitioner and, therefore, were not taxable income. Respondent has provided documentary evidence that petitioner paid for the King Air and Queen Air airplanes, which HFS was depreciating on its books. Respondent has also provided bank statements showing that HFS had insufficient funds in its account to cover the payments made to purchase these airplanes. The record establishes that the entity (GSA) which held title to the airplanes did not exist at the time the airplanes were acquired. Petitioner denied that he was a shareholder of the subsequently formed GSA but failed to provide any corroborating evidence. Petitioner did not present evidence that GSA conducted and operated a business, made any sales, collected any proceeds or monies, paid any expenses, or had any commercial, *179 agency, business, or other function. Instead, it appears to have been a mere corporate shell or alter ego with no viable effect or capacity. [2] As such, it would have no existence for Federal tax purposes and that is the way it was treated by petitioner. See . Petitioner's evidence in support of his position consists almost solely of his own testimony. Petitioner testified that, consistent with his role as an informant, the money he used to buy the King Air and Queen Air airplanes did not belong to him but were the proceeds of a loan of $ 400,000 from a drug trafficker named Glyn Rolle. Mr. Rolle was unavailable to testify as he cannot enter the United States for fear of prosecution. Petitioner presented little other evidence to support this assertion. Henry G. Johnson, a Customs agent, testified regarding petitioner's relationship *180 with that agency. However, Mr. Johnson had no knowledge of the airplanes at issue in the instant case. Ms. Dietz testified that the King Air was purchased for HFS' corporate use, e.g., charters. According to Ms. Dietz, the airplane was not purchased for a drug dealer nor for drug smuggling purposes. Neither of these aircraft was involved in any arrests or seizures during the years in issue. Petitioner has been convicted of tax evasion and filing fraudulent returns for the years in issue. At trial, petitioner admitted documenting a loan transaction that did not occur. According to testimony offered at trial, petitioner had a reputation for untruthfulness. Based on the evidence in the record, we find petitioner has failed to carry his burden of proof; we, therefore, sustain respondent on the issue of loans receivable from HFS. Petitioner also argues that respondent's net worth analysis overstates his income by $ 20,500 in 1978 because he had received repayment of a loan to Lee Allen in that year. Based on the evidence offered by respondent indicating that the balance of the loan receivable from Lee Allen on December 31, 1978, was $ 15,500, respondent now argues that this is *181 the correct figure for purposes of the net worth analysis. Petitioner claims that Mr. Allen owed him nothing at the end of 1978. However, respondent produced evidence showing that, subsequent to 1978, petitioner and Ms. Dietz sued Mr. Allen for payment on the note. The State court found that the evidence supported Mr. Allen's defense that the full amount of the note was repaid in 1979. Based on this and our previous observations with respect to petitioner's credibility, we find petitioner has failed to meet his burden of proof. While we find that petitioner has failed to meet his burden of proof, the previously mentioned concession by respondent with respect to the loan receivable from Mr. Allen plus other changes in petitioner's net worth, which were stipulated by the parties, will reduce the amount of taxable income below that determined in the notice of deficiency. Decision will be entered under Rule 155. Footnotes
1. On Mar. 7, 1990, this Court granted respondent's motion for partial summary judgment with respect to the issues of fraud and statute of limitations based on petitioner's convictions for tax evasion for the years in issue. See .↩
2. One obvious indication of this is the fact that GSA held title to petitioner's house.↩